UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN THE MATTER OF THE APPLICATION OF THE UNITED STATES FOR A SEARCH WARRANT AUTHORIZING THE SEARCH OF ONE NOKIA CELLULAR TELEPHONE SEIZED ON SEPTEMBER 16, 2022 | ) ) M.J. No. 22-4502-DHH ) ) ) ) |

<u>AFFIDAVIT IN SUPPORT OF APPLICATION</u>

I, Task Force Officer Jamie P. Vitale, being duly sworn, depose and state as follows:

1. I am a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C), that is, a government agent engaged in enforcing the criminal laws and duly authorized by the Attorney General to request a search warrant.

2. I am a Trooper with the Massachusetts State Police ("MSP"). I have been employed with the MSP for approximately 25 years. Since April 2003, I have been assigned to the Drug Enforcement Administration ("DEA") High Intensity Drug Trafficking Area ("HIDTA") Task Force as a Deputized Task Force Officer. My primary duties at the DEA include the investigation of organized narcotics traffickers. During my career, I have participated in over 1,000 narcotics-related arrests that have included: assisting in the execution of narcotics-related search warrants, physical and electronic surveillance, undercover transactions, the introduction of undercover agents, debriefing of informants, and reviews of recorded conversations and drug records. I have also received training in the field of narcotics enforcement and investigations.

3. As a Task Force Officer with the DEA, I am authorized to investigate violations of the laws of the United States, including violations of federal narcotics laws in Title 21 of the United States Code. I have received training regarding narcotics investigations while attending the basic agent academy and previously while attending the police academy.

4. I have written affidavits in support of, and/or participated in, the execution of numerous search warrants resulting in the seizure of: (a) large quantities of controlled substances and paraphernalia involved in the manufacture and distribution of controlled substances; (b) United States currency; and (c) records of narcotics and monetary transactions, drug customer lists, and other documents relating to the manufacturing, transportation, ordering, purchasing and distribution of controlled substances, as well as the collection, expenditure, accounting, transportation, and laundering of drug proceeds. I have participated in the debriefing of numerous defendants, informants and witnesses who had personal knowledge regarding large-scale narcotics trafficking organizations. I have participated in all aspects of drug investigations, including: conducting surveillance, executing searches pursuant to search warrants, executing arrests, and participating in court-authorized state and federal Title III wiretaps of cellular phones. I have received extensive specialized training in the field of controlled substance identification, investigation, and enforcement.

5. In the course of my official duties as a Trooper with the MSP and Deputized Task Force Officer with the DEA, I have been the affiant for state and federal search warrants relating to narcotics offenses. I have also interviewed multiple suspects who have violated federal and state drug laws. From my training and experience, I am familiar with the vernacular of illegal narcotics abusers and distributors. I am also familiar with a wide array of methods, practices, and techniques by which narcotics traffickers illicitly package, conceal, transport, and distribute controlled substances.

6. I am also familiar with the appearance and costs of controlled substances, including heroin, fentanyl, and cocaine, among others.

7. Based on my training and experience, I am also aware that drug traffickers commonly use cellular telephones to communicate about and further their drug trafficking activities. I am aware that drug traffickers frequently change cellular telephone numbers and cellular telephones, use multiple cellular telephones simultaneously, and use prepaid cellular telephones (where the purchaser/subscriber of the phone is not required to provide personal identifying information) in an effort to thwart law enforcement's use of electronic surveillance. I am further aware that drug traffickers often speak in vague, guarded, or coded language when discussing their illegal business in an effort to prevent detection, and often use text messages in lieu of phone calls to avoid speaking over the telephone.

8. As a result of my narcotics training and experience, I am familiar with the general characteristics of narcotics distribution cells and drug trafficking organizations ("DTOs"). A DTO consists of multiple individuals who work in concert to distribute large quantities of narcotics for profit. DTOs consist of workers, supervisors, and managers. They tend to be extremely surveillance conscious and have a good understanding of methods used by law enforcement agencies to investigate narcotics trafficking. In my experience, distribution cells often attempt to thwart investigations by: (a) limiting the use of particular cellular phones to two- to three-month periods; and (b) using pre-paid non-registered cellular phones or cellular phones registered in other people's names, which they exchange or pool within the organization.

## PURPOSE OF AFFIDAVIT

9. I submit this affidavit in support of an Application for a Search Warrant authorizing agents to search the following cellular telephone, which was seized on September 16, 2022, from Victor GONZALEZ-QUINTIN in Natick, Massachusetts: a Nokia cellular telephone

assigned telephone number (857) 407-9361, as described in Attachment A hereto (hereinafter, the "Subject Telephone").

10. The Subject Telephone currently is in the custody of the DEA at 446 Main Street, Worcester, Massachusetts. From my training and experience and the training and experience of law enforcement personnel who routinely handle this equipment, I understand that the Subject Telephone has been stored in a manner in which its contents are, to the extent material to this investigation, in substantially the same state as they were when the Subject Telephone first came into investigators' possession.

11. As set forth below, there is probable cause to believe that the Subject Telephone contains evidence, fruits, and instrumentalities of violations of federal law, including distribution of controlled substances, in violation of Title 21, United States Code, Section 841(a)(1), and conspiracy to commit narcotics trafficking offenses, in violation of Title 21, United States Code, Section 846 (the "Target Offenses").

12. As part of my duties, I participated in an investigation that led to the arrest of GONZALEZ-QUINTIN on September 16, 2022. I am familiar with the facts and circumstances leading to GONZALEZ-QUINTIN's arrest and the seizure of the Subject Telephone. Since the Affidavit is being submitted for the limited purpose of securing the requested Search Warrant, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish the requisite probable cause.

## PROBABLE CAUSE

13. On or about September 12, 2022, I received information from a DEA agent in Kansas about a 2004 grey Nissan Murano with California registration 7YAU512, registered to Pedro Gonzalez Sanchez, 30681 Calle Chueca, San Juan Capistrano, California (the "Murano")

that was on a car carrier and bound for Massachusetts. The bill of lading for the Murano indicated that it was to be delivered to "Antonio," with no last name provided, at a shopping center in Watertown, Massachusetts. The Murano, which was loaded onto the car carrier in California, had been identified by investigators in Kansas as being of interest. Investigators in Kansas had a drug-trained canine sniff the exterior of the vehicle, and the canine alerted. Following the canine alert, which indicated the presence of narcotics in the vehicle, investigators in Kansas searched the Murano. Investigators located a global positioning system tracking device, which allows for remote tracking of the location of the vehicle, stuffed between the backseat cushions of the Murano. Investigators also located an after-market mechanical hidden compartment in the dashboard of the Murano. Inside of the hidden compartment, investigators found nine individually wrapped brick-shaped packages that investigators recognized as kilograms of narcotics. One of the brick-shaped packages subsequently field tested positive for the presence of cocaine.

14. On September 16, 2022, other Massachusetts-based investigators and I followed the car carrier carrying the Murano to a service plaza on Interstate 90 in Natick, Massachusetts. The operator of the car carrier removed the Murano from the truck. At approximately 5:30 p.m., agents observed a grey Ford F-150 pickup truck arrive at the service plaza and park in the lot. The operator, who was subsequently identified as GONZALEZ-QUINTIN as described herein, got out of the truck and walked towards the car carrier.[1] GONZALEZ-QUINTIN met with the

---

[1] The passenger got out of the truck and entered the convenience store at the service plaza. He later exited the store while GONZALEZ-QUINTIN was taking possession of the Murano and got into the driver's seat of the F-150.

car carrier driver and appeared to sign a document. He took keys from the carrier driver and approached the Murano. GONZALEZ-QUINTIN unlocked the Murano and got inside of the car. GONZALEZ-QUINTIN then started the car.

15. At that time, agents approached the Murano. When agents made contact with GONZALEZ-QUINTIN, agents observed him try to break his cellphone – the Subject Telephone – in half. Agents detained GONZALEZ-QUINTIN and seized the Subject Telephone from him. GONZALEZ-QUINTIN stated that his name was "Antonio." GONZALEZ-QUINTIN was transported to the State Police barracks in Weston.

16. At the State Police barracks, GONZALEZ-QUINTIN agreed to waive his *Miranda* rights. GONZALEZ-QUINTIN stated that the previous week a Dominican male known to him as Pedro Arias approached him and asked if he would be willing to retrieve a vehicle for him while he (Arias) was in California for $200. GONZALEZ-QUINTIN stated that he agreed to retrieve the vehicle, and that Arias provided him with a cellphone and instructed him to use that telephone only to communicate with the car carrier driver and arrange to retrieve the vehicle. GONZALEZ-QUINTIN stated that he arranged to retrieve the vehicle from the car carrier driver in Natick, and that he was instructed by Arias to deliver the car to a parking lot at the corner of Columbus Street and West Adams Street in Boston, Massachusetts. When advised that investigators located nine kilograms of drugs in the vehicle, GONZALEZ-QUINTIN stated that he was not aware of the drugs being in the car. Based on my training and experience, as well as GONZALEZ-QUINTIN's behavior when approached by investigators, I do not credit his statement.

17. I also spoke with the car carrier driver who delivered the Murano. Based on my interaction with the driver, the driver called telephone number (951) 503-2868 to arrange to

deliver the Murano. The person who answered the phone instructed the driver to call telephone number (857) 407-9361 to arrange the delivery of the Murano. The driver did so. When the driver called telephone number (857) 407-9361, he spoke with a male who self-identified as "Antonio." The driver and Antonio made arrangements for Antonio to retrieve the Murano at the service plaza in Natick. When the driver and Antonio met at the service plaza in Natick, Antonio paid the driver for transporting the Murano, signed for the car, and received the keys from the driver.

18. On September 16, 2022, I called telephone number (857) 407-9361 and observed the Subject Telephone, seized from GONZALEZ-QUINTIN, ring with my number.

19. GONZALEZ-QUINTIN ultimately was arrested on an outstanding state warrant for assault and battery out of Quincy District Court and was also charged with state drug crimes. Based on the foregoing, I believe that GONZALEZ-QUINTIN used the Subject Telephone in furtherance of the Target Offenses.

DRUG TRAFFICKERS' USE OF CELLULAR TELEPHONES

20. Based on my training and experience, I know that a cellular telephone is a handheld wireless device used primarily for voice communication through radio signals. Cellular telephones send signals through networks of transmitter/receivers called "cells," enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones now offer a broad range of capabilities. These capabilities include but are not limited to: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and email; taking, sending, receiving, and storing still

photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet.  Wireless telephones may also include GPS technology for determining the location of the device.  Based on my training, experience, and research, I know that the Subject Telephone has some or all of the capabilities described above.  In my training and experience, examining data stored on devices of this type can show, among other things, evidence that reveals or suggests who possessed or used the device, as well as his criminal accomplices.

21. Based upon my training and experience, as well as the training and experience of other law enforcement agents I have worked with, I am aware that drug traffickers commonly possess and use multiple cellular telephones simultaneously to conduct their drug trafficking activities.  It is common for these cellular telephones to be retained, although not necessarily used, for months or longer by drug traffickers in their vehicles, residences, and businesses.  Drug traffickers often do not discard their cellular telephones immediately after they stop actively using them.  Therefore, while it is common for drug traffickers to stop using cellular telephones frequently, it is far less common for drug traffickers to discard their cellular telephones after they switch to new cellular telephones.  As a result, I am aware that collections of cell phones have been found during drug trafficking search warrants that have included cell phones that were no longer being used by a particular drug trafficker but had nevertheless been retained.

22. Evidence of drug crimes often is found in cell phones and smart phones used by drug traffickers.  Such evidence can include internet searches for drug-related paraphernalia, addresses, or telephone numbers, as well as incriminating communications via emails, text messages or instant messages. From my training, experience, and information provided to me by

other agents, I am aware that individuals commonly store records of the type described in Attachment B on their cellular telephones.

23.     It should be noted that, with the advance of technology, the distinction between computers and cellular telephones is quickly becoming less clear.  Actions such as internet searching or emailing, in addition to calling and text messaging, can now be performed from many cell phones.  Moreover, the particular numbers of and the particular numbers dialed by particular cellular telephones can be evidence of drug trafficking.  Such numbers can confirm relationships among and between co-conspirators, as well as the occurrence of certain events.

24.     As with most electronic/digital technology items, communications made from an electronic device, such as a cell phone, are often saved or stored on the device.  Storing this information can be intentional, for example, by saving an e-mail as a file or saving the location of one's favorite websites in "bookmarked" files.  Digital information can also be retained unintentionally.   Traces of the path of an electronic communication or of an internet search may be automatically stored in many places on a cell phone.  In addition to electronic communications, a user's Internet activities generally leave traces in the web cache and Internet history files.  A forensic examiner often can recover evidence that shows when and in what manner a user of an electronic device, such as a cell phone, used such a device.

25.     Electronic files or remnants of such files can be recovered months or even years after they have been downloaded, deleted, or viewed via the Internet.  Electronic files downloaded to a hard drive can be stored for years at little or no cost. Even when such files have been deleted, they often can be recovered months or years later using readily available forensic tools. When a person "deletes" a file on an electronic storage device such as a computer, the data contained in the file often does not actually disappear; rather, that data often remains on the

device until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space -- that is, in space on a device that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space -- for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file. Similarly, files that have been viewed via the Internet are automatically downloaded into a temporary Internet directory or "cache." The browser typically maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages. Thus, the ability to retrieve residue of an electronic file from an electronic storage device depends less on when the file was sent, downloaded, or viewed than on a particular user's operating system, storage capacity, and habits.

26. Based on all of the information I have obtained during the course of this investigation, and for the reasons more specifically set forth herein, I believe that until September 16, 2022, GONZALEZ-QUINTIN was engaged in drug trafficking. I further believe that evidence of his drug trafficking activity will be found on the Subject Telephone.

//
//
//
//
//
//
//
//

CONCLUSION

27.   Based on the foregoing, I believe there is probable cause to believe that the Subject Telephone presently contains the items set forth in Attachment B hereto, which is incorporated herein by reference, and that those items constitute evidence of the commission of criminal offenses, specifically, violations of Title 21, United States Code, Sections 846 and 841. Accordingly, I respectfully request the Court issue a search warrant for the Subject Telephone.

I declare that the foregoing is true and correct.

*Jamie P Vitale*
JAMIE P. VITALE
Task Force Officer
Drug Enforcement Administration

Subscribed and sworn to by telephone in accordance with Fed. R. Cr. P. 4.1 this 6th day of October, 2022.    9:04 a.m.

_____
HONORABLE DAVID H. HENNESSY
United States Magistrate Judge
District of Massachusetts

11

## ATTACHMENT A

Description of the Property to be Searched

A Nokia cellular telephone seized from Victor GONZALEZ-QUINTIN at the Natick Service Plaza, Natick, Massachusetts, on September 16, 2022 (DEA Exhibit N-6), currently in the custody of the Drug Enforcement Administration, 446 Main Street, Worcester, Massachusetts.

**ATTACHMENT B**

Items to be Seized from the Subject Telephone

All records and data from January 1, 2021, to September 16, 2022, in any format whatsoever (digital, electronic, or otherwise) that constitute evidence, fruits, or instrumentalities of violations of 21 U.S.C. §§ 846 and 841 (drug conspiracy and drug distribution), including, without limitation:

a. Names and contact information that have been programmed into the device (including but not limited to contacts lists) of individuals engaged in drug trafficking;

b. Logs of calls (including last numbers dialed, last calls received, time of calls, missed calls, and duration of calls) both to and from the device;

c. Text messages both sent to and received from the device (including any in draft form) relating to or referencing drug trafficking and/or referencing individuals engaged in drug trafficking;

d. Incoming and outgoing voice mail messages both to and from the device relating to or referencing drug trafficking or individuals engaged in drug trafficking;

e. GPS data;

f. Browser messages and/or internet communications (e.g., e-mail, text messages) both to and from the device (including any in draft form) relating to or referencing drug trafficking or individuals engaged in drug trafficking;

g. Documents, photographs, or videos in any format, including but not limited to Microsoft Word or Adobe PDF files, relating to or referencing drug trafficking or individuals engaged in drug trafficking;

h. All data within the device evidencing ownership, possession, custody, control, or use of the device; and

i. Service Provider handset unlock password(s) and any other passwords used to access the electronic data described above.